**Marina Rena KATELNIKOFF, Plaintiff,**

v.

**The UNITED STATES DEPARTMENT OF the INTERIOR, et al., Defendants.**

**No. A85–336 CIVIL.**

United States District Court, D. Alaska.

July 21, 1986.

..

D. Todd Littlefield, Alan L. Schmitt, James A. Bamberger, Donald S. Cooper, Alaska Legal Services Corp., Kodiak, Alaska, for plaintiff.

Mark R. Davis, Asst. U.S. Atty., Office of the U.S. Atty., Anchorage, Alaska, for defendants.

Gregory F. Cook, Douglas, Alaska, amicus curiae, for Friends of the Sea Otter.

## ORDER

HOLLAND, District Judge.

The Marine Mammal Protection Act (herein "the Act"), 16 U.S.C. §§ 1361–1407, provides for a moratorium on the taking and importation of marine mammals[1] and marine mammal products. 16 U.S.C. § 1371(a). The sea otter is expressly included in this legislation. 16 U.S.C. § 1362(5); *see also* 50 C.F.R. § 18.3. In the Act, Congress created an exemption for Alaska natives. The Act provides in relevant part:

Except as provided in section 1379 of this title, the provisions of this chapter shall not apply with respect to the taking of any marine mammal by any Indian, Aleut, or Eskimo who resides in Alaska and who dwells on the coast of the North Pacific Ocean or the Arctic Ocean if such taking—

(1) is for subsistence purposes; or

(2) is done for purposes of creating and selling authentic native articles of handicrafts and clothing: *Provided,* That only authentic native articles of handicrafts and clothing may be sold in interstate commerce: *And provided further,* That any edible portion of marine mammals may be sold in native villages and towns in Alaska or for native consumption. For the purposes of this subsection, the term "authentic native articles of handicrafts and clothing" means items composed wholly or in some significant respect of natural materials, and which are produced, decorated, or fashioned in the exercise of traditional native handi-

crafts without the use of pantographs, multiple carvers, or other mass copying devices. Traditional native handicrafts include, but are not limited to weaving, carving, stitching, sewing, lacing, beading, drawing, and painting; and

(3) in each case, is not accomplished in a wasteful manner.

16 U.S.C. § 1371(b) (emphasis in original). Pursuant to the authority granted in 16 U.S.C. § 1382, the Secretary of the Interior has promulgated regulations to implement the Act. One of these provides in relevant part:

"Authentic native articles of handicrafts and clothing" means items made by an Indian, Aleut, or Eskimo which (a) were commonly produced on or before December 21, 1972, and (b) are composed wholly or in some significant respect of natural materials, and (c) are significantly altered from their natural form and which are produced, decorated, or fashioned in the exercise of traditional native handicrafts without the use of pantographs, multiple carvers, or similar mass copying devices. Improved methods of production utilizing modern implements such as sewing machines or modern techniques at a tannery registered pursuant to § 18.23(c) may be used so long as no large scale mass production industry results.

50 C.F.R. § 18.3.

Plaintiff in this action, Marina Rena Katelnikoff, is an Aleut living on Kodiak Island. In November of 1984, she and her father, Fred Katelnikoff, shot approximately thirty-five sea otters in North Pacific waters near Port Lions, Alaska. These otters were skinned, the carcasses discarded, and the pelts hung for drying from the boom of a boat belonging to Donald Beck, Ms. Katelnikoff's fiance. The furs were later tanned.

Ms. Katelnikoff used the otter pelts to create a number of craft items, including stuffed bears, pillows, hats, mittens, and

---

1. The term "marine mammal" is defined at 16 U.S.C. § 1362(5) and includes, among others, polar bears, sea otters, walrus, whales and por-poises, seals, and sea lions. *See* 50 C.F.R. §§ 18.3, 216.3. This case concerns only the sea otter.

fur flowers which she characterizes as "cat-tails, pussy willows, and puffs". Some of these were made from commercially available patterns. Others were copied from articles she owned. Still others were made from her own design or with the assistance of local craftspeople and shop-owners. From the Alaska Department of Commerce and Economic Development she obtained the familiar silver hand tags imprinted with the words "Authentic Native Handicraft from Alaska". After tagging each of her products, she either sold them to or placed them on a consignment basis with various gift shops in Kodiak.

In May of 1985, special agents of the United States Fish & Wildlife Service obtained a warrant pursuant to 16 U.S.C. § 1377 and seized the items on the basis that they were not "authentic native articles of handicrafts and clothing" because they were not of a sort "commonly produced on or before December 21, 1972", as specified in the regulation. Although the Act does provide for criminal proceedings or the assessment of civil penalties, 16 U.S.C. § 1375, neither have been initiated; however, the seized items remain in the custody of the Fish & Wildlife service.

Katelnikoff subsequently brought suit against, among others, the Department of the Interior and its secretary, the regional director of the Fish & Wildlife Service, and the special agent who seized the items in question. In her amended complaint she contends that the regulation defining authentic native articles of handicrafts and clothing was promulgated in excess of statutory authority. She seeks a declaration that the regulation is invalid, the return of her products, and an injunction prohibiting the bringing of any civil or criminal actions against her.

The matter is now before the Court on cross-motions for partial summary judgment on the issue of the validity of the regulatory definition. A California group,

Friends of the Sea Otter[2], has requested and been granted permission to appear for purposes of filing an *amicus* brief. That brief has been filed and addressed by the parties to this action. The Court having considered the pleadings and having heard the parties in oral argument, the matter is ripe for determination.

The Administrative Procedure Act, 5 U.S.C. §§ 701–706, defines the scope of review given this Court in assessing an agency's promulgation of regulations. The Administrative Procedure Act provides, in relevant part:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning and applicability of the terms of an agency action. The reviewing court shall—
>
> . . . .
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B) contrary to constitutional right, power, privilege, or immunity;
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> . . . .

5 U.S.C. § 706.

A court must show deference to the interpretation given a statute by the agency charged with its administration, but must reject constructions that are inconsistent with the statutory mandate or that frustrate congressional intent or policy. *United States v. Louisiana-Pacific Corp.*, 754 F.2d 1445, 1447 (9th Cir.1985). The agency's interpretation must be reasonable and must not conflict with the expressed intent of Congress. *United States v. Riv-*

---

**2.** Friends of the Sea Otter is an organization primarily concerned with the protection of the southern sea otter (*enhydra lutris nereis*). Although this case concerns the northern sea otter (*enhydra lutris*), the group argued, reasonably, that a case affecting Alaska sea otters would

necessarily have an impact upon California animals. The Court concluded that permitting the Friends of the Sea Otter to appear in this action would provide a perspective sufficiently different from that of the named parties to justify its participation.

*erside Bayview Homes, Inc.,* 474 U.S. 121, 106 S.Ct. 455, 461, 88 L.Ed.2d 419 (1985). Accordingly, this Court's review is limited to the question of whether the Secretary's regulatory definition is reasonable in light of the language, policies, and legislative history of the Act. The regulation is proper and will be upheld so long as it conforms to the fundamental objective of the Act and rationally complements its remedial scheme. *Balelo v. Baldrige,* 724 F.2d 753, 760 (9th Cir.1984), *cert. denied,* 467 U.S. 1252, 104 S.Ct. 3536, 82 L.Ed.2d 841 (1984).

■ Essentially, Plaintiff argues that the statute and the regulation are irreconcilable. Plaintiff reasons that whereas the statute defines authentic handicrafts as those items produced by hand using traditional craft skills, the regulation deviates from this approach and instead looks exclusively to the nature of the finished product, requiring that it belong to a group of items produced before a certain date. Plaintiff argues that such a limitation on native uses allows her virtually no use of sea otter pelts because of the pre-twentieth century regulations on native uses and the species' near extinction during the first half of this century. Both the plain language of the statute itself and the legislative history of the native exemption, it is claimed, demonstrate that this definition of native handicrafts is inconsistent with the intent of Congress. The effects of the regulation have been, it is urged, to impede native artistic expression and commercial development, both of which have been given favored status by the native exemption to the Act.

Defendants (hereafter "the Secretary") argue generally that the language and spirit of the Act are sufficiently broad to encompass the regulation at issue here, both in the power the Act gives the Secretary and in the treatment it accords natives and marine mammals. More specifically, the Secretary asserts that the intention of the Act is to preserve marine mammals, that the purpose behind the native exemption was to preserve the traditional lifestyles of Indians, Aleuts, and Eskimos, and that neither of these encompasses the promotion and commercial expansion of the native handicraft industry in ways that would inevitably result in the depletion of sea otters. The Friends of the Sea Otter have more or less joined in these arguments and elaborated upon them.

In asserting their various interests, the parties have presented a wealth of material which, when supplemented by the record contributed by the Friends of the Sea Otter, makes an informative but not immediately relevant compendium of biological, historical, ethnographic, political, social, and economic data. As will be seen from the discussion that follows, the Court has laid aside for subsequent consideration a number of issues raised by this record.

In its present posture, this case does not require a detailed recitation of the biological background of the sea otter, a discussion of the artistic or commercial enterprises of Alaska natives, or an analysis of the complex relationship between marine mammals and this state's indigenous peoples. Nor does this matter turn solely upon the native exemption to the Act, since it is axiomatic that statutes are not to be excerpted for reading in isolation from the context of the whole act in which they appear, *Richards v. United States,* 369 U.S. 1, 11, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962).

Rather, the issue here is the relatively clear-cut problem of whether the regulation promulgated by the Secretary is consistent with the Act and in accord with the intent of Congress in adopting the Act. For reasons developed below, the Court finds the regulation to be within the proper exercise of the Secretary's authority.

The Act establishes a "moratorium" on the intentional taking of marine mammals, 16 U.S.C. § 1371(a). "Taking" is defined broadly in the Act to include actual or attempted harassing, hunting, capturing, and killing, 16 U.S.C. § 1362(12). The Secretary has supplemented this definition by further prohibiting the collection of dead animals, the restraint or detention of a marine mammal, or any negligent or intentional acts that result in the disturbing or molesting of an animal, 50 C.F.R. § 216.3.

The broad sweep of this moratorium implements the basic purpose of the Act, which has been stated in the following terms:

The Congress finds that—

. . . .

(5) marine mammals and marine mammal products either—

(A) move in interstate commerce, or

(B) affect the balance of marine ecosystems in a manner which is important to other animals and animal products which move in interstate commerce,

and that the protection and conservation of marine mammals is therefore necessary to insure the continuing availability of those products which move in interstate commerce; and

(6) marine mammals have proven themselves to be resources of great international significance, esthetic and recreational as well as economic, and it is the sense of the Congress that the should be protected and encouraged to develop to the greatest extent feasible commensurate with sound policies of resource management and that the primary objective of their management should be to maintain the health and stability of the marine ecosystem. Whenever consistent with this primary objective, it should be the goal to obtain an optimum sustainable population keeping in mind the carrying capacity of the habitat.

16 U.S.C. § 1361. Congress' overriding purpose in enacting the Act was the protection of marine mammals. *Balelo v. Baldrige*, 724 F.2d at 756. It is in this framework of preservation and protection that Congress provided the native exemption that has given rise to this case.

Under the Act, the Secretary is given a wide array of powers. In addition to the rule-making powers at issue here and noted above, 16 U.S.C. § 1382, he possesses the following powers: to waive the moratorium as to any marine mammal or marine mammal product, 16 U.S.C. § 1371(a)(3)(A); to prescribe regulations with respect to the taking and importing of marine mammals, 16 U.S.C. § 1373; to issue permits authorizing takings, 16 U.S.C. § 1374; and to transfer management authority, or to re-

voke such a transfer if already made, over individual species back to the states, 16 U.S.C. § 1379. The native exemption itself allows the Secretary, upon a finding of depletion of marine mammal stocks, to prescribe any necessary regulations to limit takings under the exemption, 16 U.S.C. § 1371(b), and a later provision empowers him to regulate the marking, tagging, and reporting of animals taken by natives, 16 U.S.C. § 1379(i).

The parties have directed the Court to the legislative history behind the enactment of the native exemption. While that material is not particularly instructive, a review of the record suffices to resolve doubts which Plaintiff has raised regarding the exemption and the regulation interpreting it.

The House of Representatives version of the Act did not allow for the taking of marine mammals for handicraft purposes. H.R.Rep. No. 707, 92nd Cong., 1st Sess. 19, *reprinted in* 1972 U.S.Code Cong. & Ad. News 4144, 4160. In the Senate, however, Senator Stevens of Alaska led efforts to protect what he perceived to be the needs of Alaska natives. When he first proposed an exemption for native takings of marine mammals, he noted for the record:

Many Alaska Natives, particularly Eskimos along the coast, depend upon ocean mammals for their existence. What little cash they are able to obtain in order to have even a marginal existence they are able to earn only through the sale of native crafts, clothing, and art works. These activities are vital for the social and economic welfare of the Alaska Native people.

. . . .

It is a well-known fact that the major market for such genuine Eskimo clothing —parkas, pants, and mukluks—native fur boots—is not the tourist, nor the exporter, but other Alaskans. We, white people, in Alaska appreciate these Eskimo improvements and depend upon them, especially in the far northern part of the State. We know that when we must travel to his [sic] part of the State, we

cannot improve upon the artifacts it has taken the Eskimo centuries to perfect.

To deny the Eskimo the right to manufacture and sell these items will not only create a hardship upon him, but also upon the white people who must live and work in an equally cruel and hostile environment.

118 Cong.Rec. 8,400 (1972). Stevens later expanded that amendment into a form subsequently enacted. Of this new amendment, he said:

The purpose of this amendment is to preserve the priceless cultural heritage of the native Alaskans by permitting them to continue to produce handmade native arts and crafts as well as clothing manufactured from sea mammals. I intend that the effect of this amendment will be to permit the total utilization of the mammals and the wise management of these wonderful and irreplaceable ocean creatures.

118 Cong.Rec. 25,260 (1972).

Hearings on the Act and especially the native exemption were held in Alaska. Regarding the testimony taken there, Stevens noted:

The subject of the hearings was the right of Alaska Natives to manufacture and sell in interstate commerce handmade Native arts, crafts, and clothing. This is the right to be let alone to continue their centuries-old way of life and the chosen trade of their forefathers.

The Alaskan Natives speak not only for themselves, but also for their cultural identity. Many of them fear the loss of their traditions and cultural assimilation.

Even more important is the necessity of earning a living in one of the harshest natural environments on the face of the globe. As I indicated at the time I introduced amendment 1048, virtually the only form of cash economy the people of northwest Alaska's coastal areas are able to obtain is through the sale of handmade Native arts and crafts and clothing. Thus, they have become totally dependent upon these mammals for even a marginal cash economy. This amend-

ment is actually a matter of life and death for the Alaska Native people.

118 Cong.Rec. 22,221 (1972).

When the committee bill came to the floor of the Senate, Senator Stevens explained at length the need for a native exemption. In the process, he spoke of the importance of preserving traditional native lifestyles:

We have sought a solution that would protect the mammals, yet not wipe out the Eskimo culture and several important native handicraft activities in the process.

. . . .

Mr. President, I believe that passing this bill without this exception would disastrously affect the Alaskan Natives. If this exception were not included, Alaskan Natives would lose their traditional way of life, the way they have lived for centuries, dependent upon seals, walruses and whales . . . . .

. . . .

Native Alaskans are proud. They do not ask for special treatment from the Federal Government. But, nonetheless, they, too, have the right to be let alone, to follow their traditional way of life. It is this way of life I seek to protect in this bill.

. . . .

Alaskan arts and crafts are an artistic and social heritage. This skill, handed down from generation to generation, reveals as much of their history as paintings Rembrandt and other famous European artists reveals [sic] of the white man's past history. Removing the privilege of passing this cultural legacy to future generations will sever children as yet unborn from the past. It will create a cultural diaspora.

118 Cong.Rec. 25,258–59 (1972).

Because the House of Representatives and Senate versions of the Act were different, the two bills went to a conference committee which specifically took up the matter of the native exemption. The conference report reflects the disagreement between the House and Senate regarding the native exemption, and the ultimate

adoption by the conference committee of the Senate version of the native exemption to the Act. That report says in pertinent part:

The House bill exempted Alaskan Indians, Aleuts and Eskimos from the moratorium and the permit requirements to the extent they take an animal for subsistence purposes, not wastefully and not for direct or indirect sale. The Senate amendment extended the exemption to allow for the so-called "cottage industries" of the Alaskan natives. The House bill would prohibit the taking, by natives or anyone else, of animals belonging to an endangered species, whereas the Senate amendment would allow such animals to be taken by natives. The conferees essentially adopted the provisions of the Senate amendment.

The conferees were aware of the relatively small amount of solid data on the effects of native taking of marine mammals, and given that lack of information were not disposed unilaterially [sic] to terminate the present levels of taking by Alaska Indians, Aleuts and Natives of marine mammals, including endangered species such as bowhead whales. The Secretary is given the authority to curtail or terminate the native taking whenever he concludes that such taking is endangering, depleting or inhibiting the restoration of endangered or depleted stocks.

1972 U.S.Code Cong. & Ad.News 4187, 4188.

Plaintiff cites to this legislative history as well as the statutory language as the bases for two related arguments. The first of these is based on a perception that it was the congressional intent that Alaska natives be given the means to create extensive commercial enterprises involving handicrafts derived from marine mammals. From this, Plaintiff argues that the regulation, with its arbitrary cut-off date, works a detriment to the congressional purpose. The record does not support this contention. Over and over again, Senator Stevens repeats that what he seeks to protect is a traditional way of life. As cited above, the purpose of his amendment was to enable natives to *continue* to produce native arts and crafts; what was to be protected was the right to be left alone and to continue their centuries-old way of life and the chosen trade of their forefathers.

While it is true that a greatly expanded cash economy based on native handicrafts derived from marine mammal parts may have been one way to achieve the cultural continuity so admired by Stevens and other legislators, there is simply no real evidence to suggest that Congress had such a goal in mind. The expressed sense of the conference committee that the native exemption would permit the continuation of the native handicraft cash economy, itself characterized as a cottage industry, with the implicit understanding that the taking of marine mammals would remain at present levels, is the clearest indicator of the mood of Congress. Taken with Stevens' earlier reference to white Alaskans as the "major market" for native handicrafts, and seen against the backdrop of frequent use of such terms as "traditional" and "cultural legacy", that report points more toward the protection of an extant industry rather than an encouragement to expand into new enterprises. Such an expansion, necessarily accompanied by greatly increased takings of marine mammals, would in any event cut directly against the very purpose of the Act itself.

Although more subtle and initially seductive, Plaintiff's second argument—to the effect that the regulation impermissibly shifts the focus from the statute's concern for traditional means of production and authentic materials to an altogether different interest in the finished product—must also fail. Such a distinction, if it even exists, does not rise to the level of creating a discontinuity between statute and regulation.

The statute does indeed define authentic native articles of handicrafts and clothing in terms of means of production and natural materials. To a considerable extent, the Secretary's regulation tracks this language by specifying that such items be composed of natural materials significantly altered and produced by the same means as delineated in the statute. The addition of a

cut-off date corresponding to the day the Act was to take effect in no way conflicts with the express statutory language, nor does it interfere with the legislative intent as laid out above. That history in fact tends to support the subject regulation, since limiting native handicraft items to those commonly produced on or before the effective date of the Act will have a tendency to restrict the taking of marine mammals to the "present levels" referred to in the conference report, 1972 U.S.Code Cong. & Ad.News 4187, 4188, thus complying with the spirit and purpose of the Act as expressed in both the statutory language and later case law.

Insofar as Plaintiff's argument that the Secretary has shifted the legislative focus and thus worked a detriment to the congressional intent is a challenge to the Secretary's rulemaking authority, the argument fails at another point as well. In a recent case, *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985), the Supreme Court has provided an appropriate response to this contention. That case involved a regulation enacted by the Corps of Engineers under the Clean Water Act. In holding that the Corps had acted reasonably in interpreting that act to require permits for the discharge of fill material into wetlands, the Supreme Court responded to an argument analogous to the one here advanced by Plaintiff. The Supreme Court noted:

> On a purely linguistic level, it may appear unreasonable to classify "lands," wet or otherwise, as "waters." Such a simplistic response, however, does justice neither to the problem faced by the Corps in defining the scope of its authority ... nor to the realities of the problem of water pollution that the Clean Water Act was intended to combat. In determining the limits of its power to regulate discharges under the Act, the Corps must necessarily choose some point at which water ends and land begins. Our common experience tells us that this is often no easy task: the transition from water to solid ground is not necessarily or even typically an abrupt one.

*United States v. Riverside Bayview Homes, Inc.*, 106 S.Ct. at 462.

It hardly needs mentioning that the Secretary must be given a reasonable latitude in fashioning a workable and enforceable guideline to evaluate finished products that combine marine mammal parts with native handicraft skills. In exercising this authority, which derives both from the Act itself as well as the Administrative Procedure Act, the Secretary must look not only at materials and means of production, but also at finished products. For the Secretary to confine himself solely to materials and means would limit him to a purely formalistic exercise not at all in keeping with either the spirit of the Act or the practical realities associated with its enforcement.

Plaintiff also makes the related argument that the legislative focus on the authenticity of the handicraft items, as opposed to their traditional aspect, precludes a regulatory definition so heavily weighted towards the traditional as to preclude any uses past the cut-off date. This argument is without serious merit. There can be no question that Congress sought to protect and even encourage authentic native handicrafts, but even more striking is that body's concern with the preservation of traditional aspects of native culture and lifestyle. Thus it is that the Act expressly requires that traditional native handicraft items be produced in "traditional" ways. Here again, if there is doubt that the express language of the Act is susceptible to the inclusion of a cut-off date, that doubt is dispelled by the legislative history discussed above. Senator Stevens testified over and over again as regards the goal of protecting traditional native ways. In this context, the Court notes that any similarity between the exemption and the thrust of AS 45.65, Native Handicrafts, is irrelevant to this matter.

The principal thrust of Plaintiff's contentions is that the adoption of the cut-off date effectively deprives the Alaska natives of any uses of sea otters under the Act. This assertion is based on the historical data suggesting that since 1741, the date of the

earliest Russian and American exploitation of sea otter populations, there have been virtually no traditional uses of sea otters by Alaska natives.[3] This asserted lack of uses, taken with a regulation permitting handicrafts only if patterned after traditional uses in practice on or before a particular date, results, it is claimed, in a severe limitation on native discretion in the production of arts and crafts and interferes with the commercial development necessary to the viability of native cultures in general.

Since the Court needs to look only to the reasonableness of the regulation as regards the statutory mandate and the intent of Congress, it is entirely conceivable that the regulation at issue could leave Alaska natives with virtually no uses of sea otters and still be consistent with the congressional intent to preserve traditional lifestyles and handicrafts. What uses may remain is a question beyond the scope of the present motions. The Court does note, however, a certain ambiguity in Plaintiff's arguments. For purposes of asserting the allegedly Draconian impact of the regulation, she claims a total lack of uses; yet the record here is replete with references to quite an array of uses, albeit some of them quite old.[4]

Keeping in mind, then, the broad authority given to the Secretary, the deference owed to his interpretation of the Act, the strongly stated purposes of the Act, and both the clear language and legislative history of the native exemption, this Court is unable to conclude that the challenged regulation is either inconsistent with the statutory language of the Act or fundamentally unreasonable. As such, the regulation is a valid expression of the Secretary's general rule-making authority and is thus immune from challenge under the Administrative Procedure Act or on any other basis presented here.

Nothing in this result will transform Alaska natives into "museum pieces" or unnecessarily restrain their creative or artistic impulses, as contended by Plaintiff. In fact, the exemption and its interpretive regulation may well have just the opposite effect. As we have seen above, the record now contains testimony, as yet unrefuted, regarding a number of early uses of sea otter parts. As native artists and craftspeople increasingly search their cultural pasts for traditional uses, they will likely broaden the range of commercial options open to them and expand their creative visions as well. Given the evidence Plaintiff herself has presented, she can hardly be heard to argue otherwise.

A few other matters remain to be addressed.

In some locales, sea otters apparently have begun to strain the carrying capacity of their immediate environment. Plaintiff has argued that these increasing populations are in some way relevant in a consideration of the validity of the regulation at

---

3. In 1792, an edict was issued by the Russian Lord Baranov, making it illegal for natives to take or possess sea otters. According to evidence presented by Plaintiff, the enforcement of the edict was greatly facilitated by a mechanism known as "the wrath of Baranov". Although the edict expired upon the American purchase of Alaska in 1867, the subsequent Yankee monopoly on the sea otter trade largely precluded native takings. A 1911 international treaty recognized the otter's near extinction and banned all takings. That treaty remained in force and precluded any native uses until 1972.

4. According to the deposition testimony of Dr. William Laughlin, there were certain limited uses of sea otter pelts and parts: the pelts for women's parkas and hats for new-born babies, the penis bone (or baculum) as a flaker in working stone blades or as a harpoon head, and the fibula from the lower leg as an awl. Another deponent, Dr. Lydia Black, states that her studies of many sources including eyewitness accounts of traders, captains and missionaries, as well as the reports of various anthropologists and ethnographers, have revealed a far wider use of sea otters in very early days. Dr. Black details finely crafted rugs, clothing such as parkas, hats, and breech-clouts for both everyday and festive use, bedding, sheaths for knives, and in one case, a child's toy—all made from pelts. She also testifies to the use of sea otter gut for window coverings and sea otter heads, which were regarded as having special symbolic value, as decor items. It is Dr. Black's belief that the sea otter played a significant and traditional role in the lives of Alaska natives long before Baranov's edict, and that that role was pervasive in daily and ritual life. The Defendants have done little to challenge this testimony.

668

issue here. The Court does not share that view and notes specifically that the Act itself already provides a number of ways in which the Secretary may deal with such changing circumstances. *See, e.g.,* 16 U.S.C. § 1371(a)(3)(A) (authorizing the Secretary to waive the moratorium as to any marine mammal).

The Defendants have invited the Court to consider a number of extraneous items, including a post-enactment letter from Senator Stevens to the Alaska Professional Hunters Association. Such evidence is not a particularly reliable or even relevant basis for inferring legislative intent. Defendants have also presented a recent letter from the Marine Mammal Commission to the general manager of the Eyak Corporation discussing the legality of native takings of sea otter under the exemption. That letter is also irrelevant to these proceedings. Apparently drafted after the filing of this suit, and reflecting only the opinion of that body, it is more properly considered a litigation document.

More important is the contention, advanced by Defendants, that Congress has repeatedly been made aware of the challenged regulation and, having chosen not to modify or amend it, may be deemed to have adopted it. Congressional committees have indeed held oversight hearings directly concerned with the impact of the Act on Alaska natives during the thirteen-year period since promulgation of the regulation here challenged. At those hearings, the question of the native exemption and the impact of the Secretary's regulations were frequent subjects of discussion. While certainly not dispositive on the question of the validity of the regulation, the lack of subsequent action on the part Congress suggests both an awareness of the regulation and an acceptance of the status quo. This inference of Congressional approval is strengthened by the fact that despite numerous amendments to the Act, the regulation in question has not been disturbed. That Congress, when faced with a particular regulation, has left the Secretary's rulemaking authority untouched while amending the Act gives rise to a presumption that the Secretary's construction has been

adopted. *Balelo v. Baldrige,* 724 F.2d at 761; *see also United States v. Riverside Bayview Homes, Inc.,* 106 S.Ct. at 464.

A party is entitled to summary judgment if he deserves to prevail as a matter of law and if, viewing the evidence in a light most favorable to the opposing party, no genuine issue of material fact remains for trial. *Friends of Endangered Species v. Jantzen,* 760 F.2d 976, 981 (9th Cir.1985). The regulation at issue here being valid as a matter of law, and Plaintiff having shown no genuine issue of material fact that would preclude the entry of partial summary judgment in favor of Defendants, it follows that Defendant's motion for partial summary judgment must be and is granted. Plaintiff's motion for partial summary judgment is denied.