**Boyd DIDRICKSON and Marina Katelnikoff Beck, Plaintiff–Intervenors,**

v.

**The UNITED STATES DEPARTMENT OF THE INTERIOR, et al., Defendants.**

**and**

**Friends of the Sea Otter, et al., Defendant–Intervenors.**

**ALASKA SEA OTTER COMMISSION and Ilarion Pletnikoff, Plaintiffs,**

v.

**The UNITED STATES DEPARTMENT OF THE INTERIOR, et al., Defendants.**

**and**

**Friends of the Sea Otter, et al., Defendants–Intervenors.**

No. A85–336 Civil.

United States District Court, D. Alaska.

July 17, 1991.

**1282**

Joseph D. Johnson, D. Todd Littlefield, Vance A. Sanders, Carol H. Daniel, Alaska Legal Services Corp., Anchorage, Alaska, for Didrickson and Beck.

Eric Smith, Anchorage, Alaska, for Alaska Sea Otter Com'n and Ilarion Pletnikoff.

Michale Carter, Asst. U.S. Atty., Anchorage, Alaska, for U.S.

Patty J. Saunders, Anchorage, Alaska, Stuart L. Somach, Sandra K. Dunn, De Cuir & Somach, Sacramento, Cal., for Friends of the Sea Otter, Greenpeace, Alaska Wildlife Alliance, and Humane Society of the U.S.

## ORDER

### (Motions for Summary Judgment)

HOLLAND, Chief Judge.

The principal question now before the court is whether or not a rule of the United States Fish and Wildlife Service (FWS) properly interpreted the phrase "authentic native articles of handicrafts", under the Marine Mammal Protection Act (MMPA).[1] Plaintiffs seek a summary judgment invalidating the FWS's "interim final rule"[2] which purports to exclude from the Alaskan native handicraft exception to the MMPA (16 U.S.C. § 1371(b)) any handicrafts made from sea otters.[3] 55 Fed.Reg. 14,793 (Apr. 20, 1990). In doing so, plaintiffs have asked this court to reconsider its earlier ruling in this case regarding a similar FWS regulation. *See Katelnikoff v. United States Dept. of the Interior*, 657 F.Supp. 659 (D.Alaska 1986). The Government opposes that motion and has filed a cross-motion for summary judgment seeking a declaration as to the regulation's validity. The defendant-intervenors[4] have opposed plaintiffs' motions and have re-

---

1. 16 U.S.C. §§ 1361–1407.

2. The pertinent portion of the "interim rule", 50 C.F.R. § 18.3(a), reads:

   *Authentic native articles of handicrafts and clothing* means items made by an Indian, Aleut, or Eskimo which (a) were commonly produced on or before December 21, 1972, and (b) are composed wholly or in some significant respect of natural materials, and (c) are significantly altered from their natural form and which are produced, decorated, or fashioned in the exercise of traditional native handicrafts without the use of pantographs, multiple carvers, or similar mass copying devices. Improved methods of production utilizing modern implements such as sewing machines or modern techniques at a tannery registered pursuant to § 18.23(c) may be used so long as no large scale mass production industry results. Traditional native handicrafts include, but are not limited to, weaving, carving, stitching, sewing, lacing, beading, drawing, and painting. The formation of traditional native groups, such as cooperatives, is permitted so long as no large scale mass production results: Provided that, it has been determined that no items created in whole or in part from sea otter meet part (a) of this definition and therefore no such items may be sold.

3. All references to sea otters contained in this order are to *enhydra lutris*, otherwise known as the northern sea otter.

4. Friends of the Sea Otter, Greenpeace, Alaska Wildlife Alliance, and the Humane Society of the United States.

quested that summary judgment be granted in their favor.[5]

The matter has been more than adequately briefed by the parties and oral argument has been heard. The court is now convinced that, in light of the most recent regulations promulgated by the FWS, the court was on the wrong track in *Katelnikoff,* and, accordingly, the court now finds in favor of plaintiffs.

## STATUTORY BACKGROUND

In 1972 the MMPA was passed, in large part as a response to public outcry over the killing of harp seal pups in Canada, the possibility of extinction of certain whale species, and the incidental killing of large numbers of porpoise by United States tuna fishermen in the eastern Pacific Ocean.[6] The MMPA (at 16 U.S.C. § 1371(a)) sets up a complete moratorium on the taking or importing of any marine mammal,[7] and then provides for certain exceptions to the moratorium. Under Section 1371(a)(1) through (a)(4), the Secretary of the Interior is given broad powers to permit exceptions to the moratorium and allow the taking of marine mammals for certain enumerated purposes.

The exception which is the subject of the instant case is found at 16 U.S.C. § 1371(b), and provides as follows:

> Except as provided in [16 U.S.C. § 1379], the provisions of this chapter shall not apply with respect to the taking of any marine mammal by any Indian, Aleut, or Eskimo who resides in Alaska and who dwells on the coast of the North Pacific Ocean or the Arctic Ocean if such taking—

> (1) is for subsistence purposes; or

> (2) is done for purposes of creating and selling authentic native articles of handicraft and clothing: *Provided,* That only authentic native articles of handicrafts and clothing may be sold in interstate commerce: *And provided further,* That any edible portion of marine mammals may be sold in native villages and towns in Alaska or for native consumption. For the purposes of this subsection, the term "authentic native articles of handicrafts and clothing" means items composed wholly or in some significant respect of natural materials, and which are produced, decorated, or fashioned in the exercise of traditional native handicrafts without the use of pantographs, multiple carvers, or other mass copying devices. Traditional native handicrafts include, but are not limited to weaving, carving, stitching, sewing, lacing, beading, drawing, and painting; and

> (3) in each case, is not accomplished in a wasteful manner.

> Notwithstanding the preceding provisions of this subsection, when, under this chapter, the Secretary determines any species or stock of marine mammal subject to taking by Indians, Aleuts, or Eskimos to be depleted, he may prescribe regulations upon the taking of such marine mammals by any Indian, Aleut, or Eskimo described in this subsection.

The MMPA grants to the Secretary broad regulatory and enforcement powers over the MMPA's implementation. Under 16 U.S.C. § 1373, the Secretary is authorized to prescribe "such regulations with respect to the taking and importing of animals from each species of marine mammal

---

5. In the absence of any factual issue, the court may grant a summary judgment to any party without requiring that a cross-motion be filed. *Portsouth Square, Inc. v. Shareholders Protective Committee,* 770 F.2d 866, 869 (9th Cir.1985); *Golden State Transit Corp. v. City of Los Angeles,* 563 F.Supp. 169, 170–171 (C.D.Cal.1983), *aff'd,* 726 F.2d 1430 n. 1 (9th Cir.1985), *cert. denied,* 471 U.S. 1003, 105 S.Ct. 1865, 85 L.Ed.2d 159 (1985).

6. Note, *Congress Amends the Marine Mammal Protection Act,* 62 Ore.L.Rev. 257, 258–59 (1983).

7. The term "marine mammal" is defined as: "any mammal which (A) is morphologically adapted to the marine environment (including sea otters and members of the orders Sirenia, Pinnipedia and Cetacea), or (B) primarily inhabits the marine environment (such as the polar bear); and, for the purposes of this chapter, includes any part of any such marine mammal, including its raw, dressed, or dyed fur or skin." 16 U.S.C. § 1362(5).

"Take" is defined to mean: "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." 16 U.S.C. § 1362(12).

... as he deems necessary and appropriate to insure that such taking will not be to the disadvantage of those species and population stocks and will be consistent with the purposes and policies [of the MMPA]." The Secretary's enforcement powers include the issuance of permits (16 U.S.C. § 1374), the authority to assess civil penalties (16 U.S.C. § 1375), and the authority to seize cargo (16 U.S.C. § 1376); and the Secretary is authorized to make arrests, engage in searches, seize evidence, and execute warrants (16 U.S.C. § 1377(c) & (d)).

## BACKGROUND FOR THE INSTANT MOTIONS

Immediately following the passage of the MMPA, the FWS, acting as the Secretary's delegate, set about promulgating regulations implementing the MMPA. Included therein was a regulation defining "authentic native articles of handicrafts and clothing". Initially the FWS definition was exactly the same as that appearing in the statute. *See* 37 Fed.Reg. 25,731–36 (Dec. 2, 1972). However, the final regulation added to the definition the requirement that the items be "commonly produced on or before December 21, 1972." *See* 37 Fed.Reg. 28,147 (Dec. 21, 1972), codified at 50 C.F.R. § 18.3.

The original plaintiff in this action, Marina Rena Katelnikoff, an Aleut living on Kodiak Island, and her husband killed several sea otters in 1984, and Mrs. Katelnikoff fashioned various items of handicrafts and clothing from the pelts. After placing Alaska Department of Commerce "Authentic Native Handicraft from Alaska" tags on the items, she placed the items for sale. In 1985, FWS agents seized the items, claiming that they did not fall within the native handicraft exception because they were not commonly made or produced prior to 1972. Mrs. Katelnikoff brought suit, claiming that the 1972 cut-off date was invalid.

In *Katelnikoff*, this court held that Congress's intent in passing the native handicraft exception was to protect extant "cottage industries", but not to encourage expansion into new growth-oriented industries. *Katelnikoff*, 657 F.Supp. at 665.

This court held that the FWS regulation was a reasonable interpretation of the statute and was therefore not subject to attack. *Id.* at 667.

While this court did uphold the regulation, it was concerned about how Section 18.3 would be applied. Initially, the FWS maintained that there were no "traditional" uses of sea otter pelts for handicrafts prior to 1972. The FWS later revised this position and asserted that the regulation required an individual native claiming rights under the exception to show a personal history of harvesting sea otters. It was then the FWS's position that uses predating western contact in 1740 would qualify.

The implementation of Section 18.3 came to a head when plaintiff-intervenor Boyd Didrickson, a Tlingit residing in Sitka, Alaska, fashioned a parka and hat from sea otter pelts and placed them for sale in Sitka. FWS agents seized the parka and hat, claiming that the items did not qualify as "traditional" because he had used metal snaps and zippers. At the time of the seizure, FWS agents informed Mr. Didrickson that the items were not authentic articles of handicraft or clothing. Then in September of 1987, Walter Steiglitz, the FWS regional director, issued a memorandum stating that traditional parkas could be made from sea otter pelts and could be sold by Alaskan natives. Mr. Didrickson's parka and hat were subsequently returned to him. However, the notice of "vacation of assessment" sent to Mr. Didrickson stated: "You should be aware that the offer for sale of some of those items to non-natives will continue to be illegal."

All of the above led this court to state as follows:

As the court intimated to counsel during the course of oral argument on this matter, the situation discussed above cries out for a reasonable administrative response. It is the court's impression that the Government's position as regards what uses may be made of sea otter pelts has been a moving target. The court entertains doubt (based on oral testimony taken at the early stages of this litigation) that the Government has

fully and adequately considered the possibility of establishment of *bona fide*, eighteenth century uses of sea otter pelts which would not be precluded by the clear language of 50 C.F.R. § 18.3."

*See* order denying government's motion to dismiss at 8 (Clerk's Docket No. 104; June 27, 1988).

The FWS responded by initiating administrative procedures to amend the regulation. On November 14, 1988, the FWS published a notice of its proposed rule which would explicitly ban all takings of sea otters for purposes of creating handicrafts or clothing. *See* 53 Fed.Reg. 45,-788–90 (Nov. 14, 1988). The stated rationale for the proposed rule was that, "Alaskan natives have apparently not commonly sold handicrafts or clothing from sea otters *within living memory*." (Emphasis added.)

Over the following two years the FWS held public hearings in ten cities throughout Alaska, as well as in San Francisco, California. The FWS also received over 2,000 written statements. On April 20, 1990, the FWS published the "interim final rule" which is the subject of this dispute. That rule was identical to the earlier regulation, except that it contained the following *caveat:*

> Provided that, it has been determined that no items created in whole or in part from sea otter meet part (a) [the 1972 cut off date] of this definition and therefore no such items may be sold.

55 Fed.Reg. 14,978, codified at 50 C.F.R. § 18.3. According to the FWS's findings:

> [T]he historical record shows little evidence of Alaska Natives using sea otters for trade, barter, or other economic purposes that involved the creation of handicraft articles or clothing.
>
> . . . .
>
> . . . No evidence has been supplied to demonstrate that handicraft and clothing articles made from sea otters were com-

monly produced for commercial sale by Alaska Natives prior to 1972.

55 Fed.Reg. at 14,976.

Three months later, the plaintiffs in both *Didrickson v. United States Dept. of the Interior* and *Alaska Sea Otter Commission v. United States Dept. of the Interior* filed motions for preliminary injunction against enforcement of the new regulation. The two cases were consolidated, and at a status conference the plaintiffs agreed to drop the preliminary injunction motions and proceed directly to the merits. The instant motions followed.

## DISCUSSION

It is the fundamental purpose of the regulatory process to select and implement the values that underlie the governing statute. In the absence of statutory guidance, these values must be found through a process of deliberation.[8] Stated differently, where the agency decision-making serves to fill a statutory "gap", the role of the agency is to make value judgments through a process of balancing competing interests with the underlying purpose of the statute. The standard by which courts review an agency's interpretation of a statute is a function of the degree to which the interpretation calls for such a deliberative process.

The Administrative Procedure Act (APA), 5 U.S.C. § 701, *et seq.*, grants federal courts judicial review over agency actions to determine whether such actions are arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with the law. 5 U.S.C. § 706. Within the case law developed under the APA, there has evolved essentially three separate standards employed by courts reviewing agency interpretations of statutes. The Supreme Court has explained:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the pre-

---

**8.** Sunstein, *Factions, Self Interest, and the APA: Four Lessons Since 1946*, 72 Va.L.Rev. 271 (1986).

cise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

... If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Sometimes the legislative delegation ... is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.

*Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). Thus, courts are to review agency interpretations on an arbitrary and capricious standard, a reasonableness standard, or what is essentially a *de novo* standard.

■ Where the governing statute contains an express delegation of legislative authority over a specific provision, Congress has in effect instructed the agency to engage in a deliberative process requiring the agency to weigh costs, benefits, and other competing interests and arrive at a value judgment. The process is by its nature highly discretionary, requiring the agency to make value judgments. Hence, judicial review of such legislative determinations is at its narrowest, asking only if the agency action was arbitrary and capricious. *See, Schweiker v. Gray Panthers,* 453 U.S. 34, 101 S.Ct. 2633, 69 L.Ed.2d 460 (1981); *Mercy Hospital of Laredo v. Heckler,* 777 F.2d 1028 (5th Cir.1985). Under this standard, it is the function of the reviewing court simply to ensure that the agency did, in fact, engage in a deliberative process. *See, Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Ins. Co.,* 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

The regulation at issue in the instant case is clearly not such a legislative regulation. The regulation purports to define what qualifies as an "authentic native article of handicraft or clothing" for purposes of section 1371(b). Section 1371(b)(2) contains an express congressional definition of that term. There is nothing in section 1371(b), or anywhere else in the MMPA, that explicitly delegates to the Secretary the authority to redefine that term.

Intervenors attempt to characterize the regulation as falling within the Secretary's general regulatory authority under section 1373. However, by the express terms of section 1371(b), the regulation cannot be so characterized. That section is prefaced, "[e]xcept as provided in [16 U.S.C. § 1379], the *provisions of this act shall not apply* with respect to...." 16 U.S.C. § 1371(b) (emphasis added).[9] Thus if the activity involved falls within the terms of section 1371(b), then no other part of the MMPA, including section 1373's grant of regulatory authority, applies to the activity.[10]

9. 16 U.S.C. § 1379 deals with the transfer of authority over marine mammal protection to state governments.

10. In this regard the instant case is readily distinguishable from *Balelo v. Baldridge,* 724 F.2d 753 (9th Cir.1984), which also involved the MMPA. At issue was a regulation that required "purse seine" tuna fishing boats to carry with them observers to collect data and information on the number of porpoise that were incidental-ly killed by such boats. The fishermen objected to that part of the regulation that authorized the use of such information in criminal proceedings against the vessel owners. Initially, the MMPA had allowed for a two-year exemption to the moratorium for such vessels (16 U.S.C. § 1371(a)(2) (1972)), conditioned upon industry compliance with section 1381. Subsection (d) required the industry to allow government observers as part of a program to develop technologies to reduce the number of porpoise inciden-

There being no explicit grant of authority to define what activities might fall within section 1371(b)'s exemption, the question is whether the FWS's interpretation is entitled to any deference. That is, has there been an implicit delegation of authority to interpret the provision, in which case the interpretation is reviewed under a reasonableness standard, or is the matter one of simple statutory construction of which the court is the final arbiter? *Natural Resources Defense Council, Inc. v. Herrington*, 768 F.2d 1355 (D.C.Cir.1985).

■ There is an implicit delegation where the power of the agency to administer a congressionally created program necessarily requires the formulation of policy in order fill a gap left by Congress. *Morton v. Ruiz*, 415 U.S. 199, 231, 94 S.Ct. 1055, 1072–73, 39 L.Ed.2d 270 (1974). It is often stated that such statutory "gaps" occur when Congress has not directly spoken to the precise question at issue. *Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. at 842, 104 S.Ct. at 2781. However, this does not mean that in every instance where Congress has not explicitly contemplated the exact question then before the court, that the court must bow to any remotely reasonable interpretation. Rather, courts are to give deference to an agency's construction of the statute where the decision as to the meaning and reach of the statute involves the reconciliation of conflicting policies. *See United States v. Shimer*, 367 U.S. 374, 382, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961).

For example, in *Bethesda Hospital Association v. Bowen*, 485 U.S. 399, 108 S.Ct. 1255, 99 L.Ed.2d 460 (1988), the question was whether or not, under the medicare program,[11] the provider reimbursement review board could decline to hear a provider's claim for reimbursement for malpractice insurance costs, where the provider had not claimed such in its report to a fiscal intermediary. Under 42 U.S.C. § 1395*oo*(a), the review board could hear claims by providers where they were "dissatisfied" with the final determination of a fiscal intermediary. The board had interpreted this statute to mean that in order to hear a claim, the claim must first have been raised in the report to the fiscal intermediary. The court held that the board interpretation was contrary to the plain meaning of the statute as well as contrary to the overall scheme of the act. *Bethesda Hospital*, 485 U.S. at 404, 108 S.Ct. at 1258–59. Even though the statute clearly did not address the exact issue before the court, the court refused to give any deference to the agency's interpretation.[12]

In *I.N.S. v. Cardoza–Fonseca*, 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987), the court struck down an agency regulation even though the statute did not deal directly with the issue before the court. The question was whether the same standards applied for determining whether an alien was entitled consideration for asylum

---

tally killed. At the end of the two-year period, any further incidental takings were to be pursuant to a permit issued by the Secretary, *"subject to regulations prescribed by the Secretary in accordance with section 1373"*. 16 U.S.C. § 1371(a)(2) (1976–1982) (emphasis added).

Therefore, in *Balelo* the regulations at issue were authorized in the statute creating the exemption as well as being within the Secretary's general regulatory authority under section 1373. In the instant case, section 1371(b) exempts the described takings not just from the moratorium, but also from the Secretary's section 1373 regulatory powers. Hence, *Balelo*'s rationale is simply not applicable to the present case.

**11.** Title XVIII of the Social Security Act.

**12.** In fact, *Bethesda Hospital* was cited for the very proposition that where a statute is not silent or ambiguous, no deference is to be given to an agency construction thereof. *K–Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988). At issue in *K–Mart* was whether deference should be given to the Secretary of Labor's definition of the term "owned by" as it appears in 19 U.S.C. § 1526. That statute precluded the importation of goods without the trademark holder's permission where the trademark is "owned by" an American company. The court held the term ambiguous where the trademark holder is in a parent/subsidiary relationship with the company importing the goods, and therefore upheld the agency's construction. However, where there is no such relationship, the statute lost its ambiguity, and the court therefore struck down a contrary agency interpretation with regard to such situations.

as applied for determining entitlement for withholding of deportation under the Immigration and Naturalization Act. The court refused to give deference to the agency interpretation because, "[t]he question whether Congress intended the two standards to be identical is a pure question of statutory interpretation for the courts to decide." *Id.* at 446, 107 S.Ct. at 1221.

In both of these cases, it was not appropriate to give deference to the agency construction because it was clear that Congress intended that only one meaning be given to the statute.

■ Deference applies where Congress has deliberately left the matter ambiguous, not intending a specific meaning, thus leaving it for the agency to develop a construction that best implements the underlying values of the legislation.[13] Where, however, it is apparent that Congress did not intend to leave such a gap but intended that a statute have a single meaning, the matter is simply one of statutory construction, and the reviewing court need not give deference to the agency's interpretation.

The instant case presents just such a situation. The term "authentic native article of handicraft or clothing" was not left undefined by Congress. The statute expressly defines the term. There is no "gap" in Section 1371 as to this term.[14] While it is true that the MMPA gives the Secretary broad regulatory authority, as stated above, that authority is much more circumscribed and focused with respect to the Alaskan native exemption. So long as the harvest is made by an Alaskan native for either subsistence purposes or for making such articles of handicraft or clothing, and is not "wasteful", the Secretary is authorized to regulate such takings only if he finds the particular species or stock to be "depleted."[15] The question of what should qualify as authentic native handicrafts or clothing does involve policy choices among competing interests. However, Congress has already made those determinations by providing its definition, complete with a non-exclusive list of examples.

Therefore the question for this court to resolve is whether or not the Secretary's interpretation is consistent with that definition. Such being a matter of pure statutory construction, there is no need to give deference to the agency's interpretation.

■ In ascertaining the plain meaning of a statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole. *Bethesda Hospital,* 485 U.S. at 403, 108 S.Ct. at 1258; *Usery v. First Nat'l Bank of Arizona,* 586 F.2d 107, 108 (9th Cir.1978). Having carefully reviewed the present regulation, the court concludes that the regulation is inconsistent with the plain language of the statute as well as the overall regulatory scheme of the MMPA.[16]

13. For example, in *I.N.S. v. Jong Ha Wang,* 450 U.S. 139, 101 S.Ct. 1027, 67 L.Ed.2d 123 (1981), the court held that the term "extreme hardship" (for purposes of determining whether or not to adjust an alien's deportable status) was sufficiently ambiguous to warrant giving deference to the agency interpretation. The court found that the question of whether to construe the term narrowly or broadly involved rendering a policy judgment which should be left to the agency to develop on a case-by-case basis.

14. This is unlike the term "wasteful" which appears in the same statute. That term was left undefined, thereby leaving it to the Secretary to give the term meaning through a case-by-case process. *See, e.g., United States v. Clark,* 912 F.2d 1087 (9th Cir.1990).

15. A substantive meaning for the term "depleted" necessarily involves a classic example of the deliberative process. In determining wheth-

er a species is depleted, the Secretary must balance the hardships upon native people of such a finding, and any regulations that might flow therefrom, against the benefits and needs to protect the marine mammals as well as the need to implement the values that underlie the MMPA. It is this sort of determination as to which the case law developed under the Administrative Procedure Act recognizes that a court should not substitute its judgment for that of the regulator.

16. Plaintiffs have argued strenuously that the Ninth Circuit's holding in *Kenaitze Indian Tribe v. State of Alaska,* 860 F.2d 312 (9th Cir.1989), mandates this finding. The court wishes to make it clear that this is in no way true. *Kenaitze* decided a narrow issue and is of little precedential value for this case. The issue there was whether or not the State of Alaska had properly defined the term "rural" for purposes

The general provisions of the MMPA are not applicable to "the taking of *any marine mammal*" (emphasis added) if the taking is done either for subsistence purposes or for creating authentic native handicrafts. 16 U.S.C. § 1371(b). This language plainly allows for the taking of any species of marine mammal so long as it is done for a permitted purpose: subsistence or for the making of native articles of handicraft or clothing.

The FWS's most recent definition of "authentic" singles out a particular species for special treatment, even though a facial reading of the statute shows that no such particularized treatment was contemplated. The Government's position is that products made from sea otters do not qualify as "traditional" native handicrafts and therefore do not fall within the statute's requirement that the handicrafts be "authentic". This finding is based upon a strained interpretation of the word "traditional". But, more fundamentally, the Government's attempt to define "authentic" in terms of whether the end product is a "traditional" item is plainly inconsistent with the definition of "authentic" as set out in section 1371(b)(2).

Essentially, the Government's position is that, for purposes of section 1371(b), "traditional" native handicrafts are only those items commonly produced for commercial sale within "living memory" before 1972. Hence the regulation creates an artificial time period from roughly 1900 through 1972 within which the search for traditional Alaskan native articles is limited. This rationale turns on its head any ordinary conception of the word "traditional".

The cultures of Alaskan native had been thriving for centuries prior to the first arrival of Western Europeans and Russians in the middle eighteenth century. As is true with any ancient culture, Alaskan native traditions have been handed down from generation to generation throughout the centuries. Yet with increasing outside influence in the region, many such traditions were seriously curtailed. The history surrounding sea otters provides but one example, although probably the most extreme example. To satisfy the Russian demand for sea otter pelts, Lord Baranoff issued an edict in 1792 forbidding Alaskan natives from hunting sea otters. By 1799, the Russians had virtually enslaved the Aleuts by requiring all males between the ages of eighteen and fifty to labor, primarily hunting sea otter, for the Russian America Company.[17] It is well documented that under Russian rule the sea otter population in Alaska nearly became extinct. Thus after the United States purchased Alaska from the Russians it prohibited all hunting of sea otters as part of the Fur Seal Treaty. 36 Stat. 326, § 4 (1910). The net effect was that, through no choice of their own, all Alaskan natives were deprived of the opportunity to use sea otters as they had traditionally done for centuries.

The fact that Alaskan natives were prevented, by circumstances beyond their control, from exercising a tradition for a given period of time does not mean that it has been lost forever or that it has become any less a "tradition". It defies common sense to define "traditional" in such a way that only those traditions that were exercised during a comparatively short period in history could qualify as "traditional".[18]

---

of the subsistence preference mandated by the Alaska National Interest Lands Conservation Act 16 U.S.C. § 3113. The court simply found Alaska's definition contrary to the plain meaning of the word "rural". In doing so, the court reiterated the unremarkable proposition that a statute should be interpreted in accord with the plain meaning of the language. The case represents nothing new or particularly helpful with regard to the instant case.

**17.** J.R. Gibson, *Russian Expansion in Siberia and America: Critical Contrasts* at 34 (S.F. starr ed. 1987).

**18.** In fact, this court, in originally upholding the 1972 cut-off date, clearly understood that there was no limit as to how far back in history Alaskan natives could search for their traditions. This court stated:

Nothing in this result will transform Alaska natives into "museum pieces" or unnecessarily restrain their creative or artistic impulses, as contended by Plaintiff. In fact, the exemption and its interpretive regulation may well have just the opposite effect. As we have seen above, the record now contains testimony, as yet unrefuted, regarding a number of early uses of sea otter parts. As native artists and

Equally artificial is the Government's requirement that not only must the items be ones commonly produced in the twentieth century, but that they also have been commercially sold during that same time period. The Government has argued before this court that the present regulation is justified because even if items made from sea otters were commonly made within living memory, they were not generally sold to non-natives. Moreover, the Government contends that the regulation is further justified because it does not prevent the production of such items for subsistence purposes, but only for purposes of being sold to non-natives. Apparently, Government feels that included in "subsistence uses" is the sale of such items to other natives.[19]

The government's discussion and findings that there is little evidence of commercial trade of items made from sea otter are unpersuasive. The argument is a makeweight. Assuming that the Fur Seal Treaty (36 Stat. 326 (1910)) was effective, it necessarily follows that there was no commerce between native and non-natives in sea otter items between 1910 and enactment of the MMPA in 1972. More generally, the absence of commercial transactions with non-natives is not at all instructive on the question of whether there was traditional use of sea otter even after 1910 by and between natives.

The Government's position in this regard is particularly untenable. It again defies common sense to assert that an item is not "traditional" because it has not been regularly sold to western Europeans. The court can hardly think of anything more "traditional" to an Alaskan native than making a parka made from animal fur and exchanging it for some other useful item.

In adopting the regulation, the FWS did not dispute that sea otter had been in use for clothing prior to the 1972 cut-off date. 55 Fed.Reg. 14,792. Yet because the items were not commonly sold to non-natives, the FWS characterized such items as not being traditional. *Id.* at 14,794.

There is an additional shortcoming in the Government's concept of what may be "traditional". The regulatory definition of "authentic" in terms of whether the end product is a traditional item is fundamentally at odds with the definition contained in section 1371(b)(2). The statute does not define "authentic articles of native handicrafts or clothing" in terms of whether the item itself is a traditional native handicraft. Rather, it defines as authentic those items that are "produced, decorated, or fashioned in the exercise of traditional native handicrafts". Thus the statutory definition refers not to the item as being traditional, but to the craft employed to produce the item. The statute gives examples of the types of activities that constitute a traditional native handicraft. Those include among others stitching, sewing, and lacing. Under the express terms of the statute, an item that was produced employing traditional crafts, such as sewing, qualifies as an authentic article of native handicraft.[20]

We do not address at this time the question of whether or not an end product may be so far outside the realm of items that are traditionally produced by Alaskan natives that it would be impossible to characterize such as being the product of a traditional craft. However, to define "authentic" in terms of the end product is clearly inconsistent with the statutory definition.

---

craftspeople increasingly search their cultural pasts for traditional uses, they will likely broaden the range of commercial options open to them and expand their creative visions as well.

*Katelnikoff,* 657 F.Supp. at 667.

**19.** The fact that the Government believes that a sale to a non-native is somehow more of a commercial transaction than a sale to another Alaskan native reveals a fundamental misunderstanding of the realities of this state. Alaska is a vast state (the size of four Californias), whose

original inhabitants were not a single people, but were peoples with languages and cultures as diverse and different as any region on the globe. It defies common sense to characterize transactions in goods between these various peoples as any but commercial trade.

**20.** All of the items seized from Mr. Didrickson were items produced from the sewing of sea otter pelts. Thus, from a simple facial reading of the statute, it is clear that these items fall within the express terms of the statute.

The Government does not now seriously contend that its definition of "authentic" is consistent with the plain language of section 1371(b). Rather, the Government seeks to justify the regulation as a reasonable implementation of the congressional intent underlying the native exemption. This argument is based upon this court's earlier ruling that the purpose of the native handicraft exception was to protect existing native handicraft "cottage industries", and that it was the express sense of Congress that the taking of marine mammals would remain at 1972 levels. *Katelnikoff*, 657 F.Supp. at 665. Since there were few, if any, commercial sales of sea otter handicrafts as of 1972, the Government argues that the regulation is completely consistent with congressional intent.

The problem with this court's earlier ruling is that it failed to recognize that what the Government was arguing as a justification, in reality worked an "end run" around the regulatory scheme of the act as a whole. In essence, the Government is seeking to limit the taking of marine mammals to 1972 levels as a means of regulating the number of marine mammals taken by native people. By its express terms, however, section 1371(b) does not allow this sort of regulation.

As stated above, section 1371(b) clearly states "the provisions of this act shall not apply" to takings for the purpose of creating authentic native handicrafts. Thus, the broad grant of regulatory authority granted to the Secretary by section 1373 does not apply to takings under the native handicrafts exception. Any regulatory authority of the Secretary over such takings must be found in section 1371(b) itself. Under Section 1371(b), the Secretary's authority to issue regulations is limited to the situation where the "Secretary determines any species or stock of marine mammal ... to be depleted". To redefine the term "authentic" in order to maintain a particular harvest level is to work an "end run" around the requirement that there first be a finding of depletion. Had Congress intended to authorize the Secretary to maintain any particular harvest level for purposes of the exception, it would have explicitly given the

Secretary such power. Everywhere else in the MMPA the Secretary is explicitly given broad regulatory powers. Section 1371(b) is clearly intended to limit the Secretary's authority.

Congress considered and rejected an amendment that would have explicitly limited the taking of marine mammals for handicrafts to: "where such a taking is for use and sale of traditional native arts and crafts *in conformity with existing patterns of the Alaskan natives arts and crafts industry and does not promote commercial growth industry.*" Senate Amendment No. 1154 to H.R. 10420 (Apr. 20, 1972). This amendment would have accomplished exactly what the FWS now seeks, yet Congress deliberately chose language giving Alaskan natives greater flexibility and the Secretary less power to regulate.

As it stands, the FWS has defined the term "authentic" in such a way as to broaden its own regulatory authority over activities that the plain language of the statute would not otherwise permit. This it does not have the power to do, and the regulation fails.

## CONCLUSION

This opinion should not be construed as authorizing a "free-for-all" killing of hundreds of sea otters. All that has been said is that the Secretary of Interior, through the FWS, does not have the authority to *regulate* the harvesting of sea otters for purposes of creating native handicrafts absent a finding of depletion. This does not mean the FWS has somehow lost its enforcement powers, particularly with regard to the requirement that the takings not be wasteful. Moreover, a particular article must still satisfy the statutory definition of "authentic".

What is clear is that the present FWS regulation defining "authentic" article of native handicrafts is fundamentally inconsistent with 16 U.S.C. § 1371(b). Accordingly, the court finds in favor of plaintiffs on their motion for summary judgment, and against defendants and defendant-in-

tervenors on their cross-motions. Specifically, this court orders and declares that part (a) of 50 C.F.R. § 18.3 is inconsistent with the Marine Mammal Protection Act.