Boyd **DIDRICKSON** and Marina Katelnikoff Beck, Plaintiff–Intervenors,

v.

**UNITED STATES DEPARTMENT of the INTERIOR, et al., Defendants.**

and

Friends of the Sea Otter, et al., Defendant–Intervenors.

**ALASKA SEA OTTER COMMISSION and Ilarion Pletnikoff, Plaintiffs,**

v.

**UNITED STATES DEPARTMENT of the INTERIOR, et al., Defendants.**

and

Friends of the Sea Otter, et al., Defendant–Intervenors.

No. 91–36323.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 18, 1992.

Decided Dec. 28, 1992.

Stuart L. Somach and Sandra K. Dunn, DeCuir & Somach, Sacramento, CA for defendants-intervenors-appellants.

Katherine W. Hazard, U.S. Dept. of Justice, Washington, DC, for defendants-appellees.

Carol H. Daniel and Joseph D. Johnson, Alaska Legal Services Corp., and Eric Smith, Anchorage, AK, for plaintiffs-appellees.

Beck and Didrickson; Eric Smith, Anchorage, AK, for plaintiffs-appellees Alaska Sea Otter Com'n and Pletnikoff.

Before: HUG, D.W. NELSON, and T.G. NELSON, Circuit Judges.

HUG, Circuit Judge:

This case concerns the validity of a portion of the regulation issued by the United States Fish and Wildlife Service ("FWS") interpreting the Marine Mammal Protection Act of 1972 ("MMPA"), Pub.L.No. 92–522, 86 Stat. 1027, *codified at* 16 U.S.C. §§ 1361–1407 (1988), as it applies to Alaska Natives who make authentic articles of handicrafts and clothing from sea otters. The MMPA imposes a complete moratorium on takings and importations of all marine mammals. Takings by Alaska Natives are exempt from the moratorium if the taking is for subsistence purposes or for the creation and sale in interstate commerce of authentic native articles of handicrafts and clothing. The principal question in this appeal is whether the regulation of the FWS properly interpreted the statute when it restricted the exemption to apply only to articles that were commonly produced on or before December 21, 1972, and

specifying that no item made from northern sea otter met that requirement. Ruling on cross-motions for summary judgment, the court invalidated that portion of the regulation.

Also involved in this case is a novel procedural issue. The Friends of the Sea Otter, Greenpeace, Alaska Wildlife Alliance, and the Humane Society of the United States (collectively referred to as "FSO") were allowed by the district court to intervene as permissive intervenors on behalf of the Government. The Government and the FSO appealed the judgment of the district court. The Government has since dismissed this appeal and now acquiesces in the judgment of the district court. The FSO have proceeded with the appeal. The Government now challenges the standing of the FSO to proceed with the appeal.

The district court had jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1361. We have jurisdiction over the FSO's primary appeal pursuant to 28 U.S.C. § 1291, and we affirm.

## I.

Some exceptions to the MMPA moratorium on takings are provided explicitly in the Act, and the Secretary of the Interior is given broad powers to permit exceptions for certain purposes. 16 U.S.C. § 1371(a) (1988).

The exception at issue concerns takings by Alaska Natives. Section 1371(b) provides that the moratorium does not apply to takings of marine mammals by coastal Alaska Indians, Aleuts, and Eskimos if the taking:

(1) is for subsistence purposes; or

(2) is done for purposes of creating and selling authentic native articles of handicrafts and clothing: *Provided,* That only authentic native articles of handicrafts and clothing may be sold in interstate commerce: *And provided further,* That any edible portion of marine mammals may be sold in native villages and towns in Alaska or for native consumption. For the purposes of this subsection, the term "authentic native articles of handicrafts and clothing" means items com-

posed wholly or in some significant respect of natural materials, and which are produced, decorated, or fashioned in the exercise of traditional native handicrafts without the use of pantographs, multiple carvers, or other mass copying devices. Traditional native handicrafts include, but are not limited to weaving, carving, stitching, sewing, lacing, beading, drawing, and painting; and

(3) in each case, is not accomplished in a wasteful manner.

16 U.S.C. § 1371(b) (1988). The statute also provides that the Secretary of Interior may regulate takings by Alaska Natives if the Secretary determines that any species or stock of marine mammals is "depleted." *Id.*

In the original regulations promulgated by the FWS to implement the MMPA, the definition of "authentic native articles of handicrafts and clothing" was the same as that contained in the statute. 37 Fed.Reg. 25,731 (1972). In the final regulation, the FWS added the requirement that the items be "commonly produced on or before December 21, 1972." 39 Fed.Reg. 7262 (1974) (codified at 50 C.F.R. § 18.3). In 1990, the regulation was amended to exclude all items made from sea otters. 55 Fed.Reg. 14,973, 14,978 (1990).

## II.

In 1984, Marina Rena Katelnikoff Beck, an Aleut living on Kodiak Island, and her father killed several sea otters. Mrs. Katelnikoff Beck made several items of handicrafts and clothing from the pelts, and placed the items for sale. In May 1985, the FWS agents confiscated items including growling teddy bears, pillows, hats, mittens, and fur flowers characterized by Katelnikoff Beck as "cat-tails," "pussy willows," and "puffs," on the basis that they did not fall within the native handicraft exception because they were not of a nature commonly made or produced prior to the passage of the MMPA in 1972.

Mrs. Katelnikoff Beck challenged the requirement in 50 C.F.R. § 18.3 that Native articles of handicrafts and clothing made for sale in interstate commerce be those "commonly produced on or before Decem-

ber 21, 1972," in order to be exempt from the moratorium on takings imposed by the MMPA. Both parties moved for partial summary judgment, and the FSO appeared as amicus curiae in favor of the Government's motion.

Before the court ruled on the motions, another Alaska Native, Boyd Didrickson, a Tlingit living in Sitka, moved to intervene as Plaintiff–Intervenor on June 16, 1986. The FWS had confiscated a parka and hat made for sale by Didrickson out of sea otter fur because they contained metal snaps and zippers, which did not qualify as traditional, according to the FWS. Didrickson's parka and hat were later returned to him, after the FWS regional director issued a memorandum stating that traditional parkas could be made from sea otter pelts and could be sold by Alaska Natives. However, Didrickson was also informed by the FWS that the offer for sale of some of those items to non-Natives would continue to be illegal.

Didrickson's motion to intervene was granted, and on July 21, 1986, the court granted the Government's motion for partial summary judgment and upheld the regulation. The district court found that Congress's intent in passing the native handicraft exception was to protect existing "cottage industries," but not to encourage "a greatly expanded cash economy" based upon those industries. *Katelnikoff v. United States Dep't of Interior,* 657 F.Supp. 659, 665 (D.Alaska 1986). The court held that the FWS regulation was a reasonable interpretation of the statute and thus was valid. *Id.* at 667. The plaintiffs' application for interlocutory appeal was denied, and Katelnikoff Beck then agreed to the dismissal of her claims.

The Government sought dismissal of Didrickson's action, and Didrickson amended his complaint to allege that the regulation approved by the district court was void for vagueness. The Government moved for dismissal again, but the district court denied the motion and advised the Government to review administratively the regulation as it applied to the taking of sea otters. The judge was concerned with the requirements that the items be "commonly produced on or before December 21, 1972." He described the Government's position on what uses of sea otter pelts were permissible as a "moving target," and expressed "doubt ... that the Government has fully and adequately considered the possibility of establishment of *bona fide,* eighteenth century uses of sea otter pelts which would not be precluded by the clear language of 50 C.F.R. § 18.3."

The Government began a review of the regulation by publishing a proposed amendment to the regulation, to ban all takings of sea otters for purposes of creating handicrafts or clothing for sale, on the ground that Alaska Natives had not "commonly produced and sold handicrafts or clothing from sea otters within living memory." 53 Fed.Reg. 45,788, 45,789 (1988). The litigation was stayed pending issuance of a final rule.

After extensive hearings in which the Alaska Natives and the FSO participated and submitted evidence, the FWS amended the regulation on April 20, 1990, to provide in effect that items created in whole or in part from the sea otter did not meet the exemption from the MMPA. 55 Fed.Reg. 14,973 (1990). The FWS based its conclusion upon the finding that "no handicraft trade using sea otters by Alaska Natives was in existence prior to passage of the Act that would allow the utilization of sea otters under the handicraft exemption." *Id.*

### III.

The Alaska Natives vigorously contest this factual determination on the basis of extensive evidence of centuries of use by Alaska Natives of the sea otter for many purposes, including clothing, handicrafts and items of barter and trade. They point to the fact that after the Russians' occupation and their discovery of the uses of the sea otter in 1742, the Russians, using the Alaska Natives to harvest the sea otter, banned the sea otters' use by Alaskan Natives. This restriction continued after Russia sold Alaska to the United States, as a practical matter, because their American traders who dominated the sea otter fur trade acted just as the Russian predeces-

sors had. Through excessive hunting of the sea otters, they virtually became extinct by 1899. From then on, various restrictions by the United States on the harvesting of sea otters precluded Alaska Natives from using sea otters as they had done for centuries. The Natives point out that for centuries the sea otter had been an intrinsic part of the subsistence way of life of the Alaska Natives. The sea otter had been used for items of clothing, rugs, blankets, bedding, and items of handicraft that were traded and bartered by the Alaska Natives. The centuries of use were interrupted during the period in which Natives were banned from using the sea otter by the Russians and, in turn, by the United States prior to 1972. The Alaska Natives point out that although once virtually extinct, the sea otter has rebounded in recent times to the point that the FWS now estimates the current sea otter population has regained, if not exceeded, its historic levels of 150,000 to 200,000 animals. 50 Fed.Reg. 49,577, 49,579 (1985).

The pertinent part of the regulation, as amended, reads:

> *Authentic native articles of handicrafts and clothing* means items made by an Indian, Aleut, or Eskimo which (a) were commonly produced on or before December 21, 1972, and (b) are composed wholly or in some significant respect of natural materials, and (c) are significantly altered from their natural form and which are produced, decorated, or fashioned in the exercise of traditional native handicrafts without the use of pantographs, multiple carvers, or similar mass copying devices.

50 C.F.R. § 18.3 (1991) (emphasis in original).

Didrickson filed an amended and supplemental complaint challenging the regulation, and Katelnikoff Beck filed a complaint in intervention. The Alaska Sea Otter Commission filed a separate action also challenging the regulation; that case was later consolidated with the *Didrickson* case.

The FSO were permitted to intervene as defendants in support of the regulation pursuant to Fed.R.Civ.P. 24(b). Both sides moved for summary judgment, and the court struck down the amendment to the regulation, holding that "part (a) of 50 C.F.R. § 18.3 and the portion of 50 C.F.R. § 18.3 that expressly relates to sea otters are each inconsistent with the [MMPA] and are invalid." Judgment, Sept. 9, 1991. The court determined that this part of the regulation that excluded any handicrafts made from sea otter was contrary to Congress' express definition of "authentic native articles of handicraft or clothing" in 16 U.S.C. § 1371(b)(2), 796 F.Supp. 1281.

The Government filed a timely notice of appeal, but later moved to dismiss its appeal. The motion to dismiss was granted on March 30, 1992. The Government now acquiesces in the district court's holding and claims in its briefs, for the first time, that the FSO have no standing to appeal from the judgment. The FSO also filed a timely notice of appeal, and moved for leave to file supplemental declarations in support of their standing.

## IV.

The FSO participated in the district court proceedings as amicus curiae and then as permissive intervenors on the side of the Government. The Government's acquiescence in the district court's judgment has spawned a number of questions about appellate jurisdiction. The federal Appellees contend that there is no subject matter jurisdiction over the FSO's appeal because there is no case or controversy between the FSO and Katelnikoff Beck and Didrickson, or between the FSO and the Government.

Specifically, the Government argues that jurisdiction does not exist because:

(A) there is no ripe, live controversy;

(B) the FSO cannot defend the regulation on behalf of the Government; and

(C) the FSO [have] failed to establish the requisite particularized, concrete and immediate injury to establish standing.

■ Jurisdiction is reviewed *de novo*. *See Nevada v. Burford*, 918 F.2d 854, 856 (9th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2052, 114 L.Ed.2d 458 (1991).

■ A permissive defendant-intervenor must have independent jurisdictional

grounds on which to pursue an appeal, absent an appeal by the party on whose side the intervenor intervened. *Diamond v. Charles*, 476 U.S. 54, 68, 106 S.Ct. 1697, 1706–07, 90 L.Ed.2d 48 (1986). An interest strong enough to permit intervention is not necessarily a sufficient basis to pursue an appeal abandoned by the other parties. *Yniguez v. State of Arizona*, 939 F.2d 727, 731 (9th Cir.1991). The intervenor also must satisfy the requirements of Article III. *Diamond*, 476 U.S. at 68, 106 S.Ct. at 1706–07.

■ To satisfy the case or controversy requirement of Article III, the intervenor must show that the intervenor has suffered an injury in fact, which is fairly traceable to the challenged action and is likely to be redressed by the relief requested. *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324–25, 82 L.Ed.2d 556 (1984); *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1513 (9th Cir.1992); *Yniguez*, 939 F.2d at 731–33 (intervenor satisfied Article III standing criteria for appeal by alleging threat of particularized injury from the order appealed, redressable by successful appeal). A party must allege "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination...." *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).

■ Where one presents a cause of action under the Administrative Procedure Act ("APA"), complaining of injury inflicted by agency action, one must show injury to an interest arguably within the zone of interest sought to be protected by the statute that the agency allegedly violated. *See* 5 U.S.C. § 702 (1988); *Sierra Club v. Morton*, 405 U.S. 727, 733, 92 S.Ct. 1361, 1365, 31 L.Ed.2d 636 (1972).

### A.

First we consider whether the FSO have alleged a case or controversy within the meaning of Article III of the Constitution. Because the MMPA does not provide for citizens to sue to enforce the statute, the FSO could not have sued the Natives in district court, so the Government concludes that there is no ripe, live action between the FSO and the Alaska Natives. Although the FSO's interest was strong enough to permit intervention, the Government contends it is not strong enough to support an appeal absent an appeal by the Government, under *Yniguez*, 939 F.2d at 731. We disagree.

■ An intervenor's standing to pursue an appeal does not hinge upon whether the intervenor could have sued the party who prevailed in the district court. To determine whether an intervenor may appeal from a decision not being appealed by one of the parties in the district court, the test is whether the intervenor's interests have been adversely affected by the judgment. *Yniguez*, 939 F.2d at 731–32; *NL Indus., Inc. v. Secretary of Interior*, 777 F.2d 433, 436 (9th Cir.1985). Generally, an intervenor may appeal from any order adversely affecting the interests that served as the basis for intervention, provided that the requirements of Article III are satisfied. *Yniguez*, 939 F.2d at 731.

■ The facts of this case make clear that a live controversy exists as to whether takings of sea otters by Alaska Natives for purposes of making handicrafts for sale in interstate commerce are exempt from the MMPA moratorium on takings. Katelnikoff Beck and Didrickson sued the FWS under the APA, to challenge the regulation. The FSO's intervention was based upon their interests, which were in conflict with the Native Alaskans' position. The fact that the MMPA does not provide for citizen enforcement of the Act does not affect the FSO's right to pursue an appeal. The FSO did not intervene in an enforcement action. In granting the FSO's motion to intervene, the district court stated:

> Were this case still essentially an enforcement proceeding against plaintiffs, the court would be very much disinclined to permit intervention. The fact is, however, that the scope of this case has broadened substantially since its commencement. The Government has enacted regulations pertinent to the taking

and use of sea otter, and the prospective intervenors have participated in those rule-making proceedings. In light of the more generalized nature of these proceedings as they are now formulated, the court perceives that the would-be intervenors do have a sufficient interest in these proceedings to justify permissive intervention.

As the district court noted, the scope of the case changed considerably as it became a review of the FWS regulation. The APA clearly provides for such review.

■■■ The Government's acquiescence in the district court judgment effectively is the same as promulgating a regulation that is contrary to the FSO's position. The Government correctly argues that litigation decisions are generally committed to agency discretion by law, and are not subject to judicial review under the APA. 5 U.S.C. § 701(a)(2) (1988); *Heckler v. Chaney*, 470 U.S. 821, 831, 105 S.Ct. 1649, 1655–56, 84 L.Ed.2d 714 (1985). However, the FSO do not claim to be seeking judicial review of the Government's decision not to appeal. Rather, the FSO are seeking to protect what they believe is the correct interpretation of the MMPA.

The FSO are not retroactively creating jurisdiction based on postcomplaint litigation conduct. *See Lujan v. Defenders of Wildlife*, — U.S. —, —— n. 4, 112 S.Ct. 2130, 2141 n. 4, 119 L.Ed.2d 351 (1992). Federal jurisdiction is ordinarily determined according to "the facts *as they exist when the complaint is filed." Id.* (citation omitted) (emphasis in original).[1] Jurisdiction pursuant to the APA existed prior to the Government's decision to acquiesce, and continues to exist. Indeed, because the FSO actually litigated the issues in the district court, a new suit by the FSO challenging the judicially amended regulation

allowing commercial taking of sea otters by Alaska Natives would be barred by collateral estoppel and *res judicata.*

■■■ We hold that the FSO have alleged a case or controversy within the meaning of Article III.[2]

### B.

■■■ The Government argues that only the Government has standing to defend its own regulation. *See Diamond*, 476 U.S. at 65, 106 S.Ct. at 1705 ("Because the State alone is entitled to create a legal code, only the State has the kind of 'direct stake' identified in *Sierra Club v. Morton* ... in defending the standards embodied in that code.")

Not only the Government or one in an analogous position, such as the sponsors of the ballot initiative in *Yniguez*, may defend Government regulations. An intervenor was permitted to appeal from a district court order invalidating a federal regulation, absent an appeal by the Government, in *National Wildlife Fed'n v. Lujan*, 928 F.2d 453, 456 n. 2 (D.C.Cir.1991). The Secretary complied with the district court order, but did not promulgate a new regulation consistent with the order. Because the intervenor-industry groups could benefit from an appellate decision reversing the district court, the intervenors' appeal was considered appropriate for review. *Id.* (holding that the issue was not mooted by Government's acquiescence). Similarly, the FSO's appeal is appropriate.

### C.

■■■ Whether the FSO have established the particularized, concrete and immediate injury necessary to support standing is also at issue. The FSO submitted declarations

---

1. Standing failed in *Defenders of Wildlife* partly because the injury asserted was not redressable by the action brought. At issue was a regulation, promulgated pursuant to the Endangered Species Act, which concerned consultation by federal agencies with the Secretary of the Interior. Because the agencies were not bound by the regulation, the plaintiffs' alleged injury could not be redressed, even if the agencies were parties to the suit. — U.S. at —— – ——, 112 S.Ct. at 2140–42.

2. We note that the FSO's argument that a case or controversy continues to exist because the FSO are liable for costs and attorney fees to the prevailing parties at the trial court level is precluded by *Diamond.* Liability for fees is not an injury with a nexus to the substantive character of the statute at issue (injury fairly traceable to the challenged action). *See Diamond*, 476 U.S. at 70, 106 S.Ct. at 1707–08 (citing *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982)).

alleging particularized injury in support of their motion to intervene, and submitted supplemental declarations after the Government challenged the FSO's standing on appeal. We accept the supplemental declarations because the FSO were not required, under Ninth Circuit law, to establish standing in order to intervene; only now must they demonstrate particularized injury. *See Portland Audubon Soc'y v. Hodel,* 866 F.2d 302, 308 n. 1 (9th Cir.), *cert. denied,* 492 U.S. 911, 109 S.Ct. 3229, 106 L.Ed.2d 577 (1989).

 The party who seeks to invoke federal jurisdiction has the burden of establishing that it has suffered an injury in fact, "an invasion of a legally-protected interest" that is concrete and particularized, and actual or imminent, not conjectural or hypothetical. *Defenders of Wildlife,* — U.S. at —, 112 S.Ct. at 2136. If offered in response to a summary judgment motion, the party must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion are taken to be true. *Id.,* — U.S. at —, 112 S.Ct. at 2137. This case was resolved by summary judgment, but jurisdiction was not contested until appeal. Because the FSO seek reversal of summary judgment, the standard for establishing injury at summary judgment is appropriate. The FSO's status as a public interest group also affects the standard:

> When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred ... in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue.... [W]hen ... a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else,* much more is needed.

*Id.* (holding that respondents failed to demonstrate injury and redressability) (emphasis in original).

 The FSO have shown, through specific facts, that one or more of their members will be directly affected apart from their special interest in the subject of the suit. *See id.,* — U.S. at —, 112 S.Ct. at 2138 (where affiants failed to specify exactly when they expected to return to the specific areas where challenged agency action occurred, their claims did not establish that the injury was actual or imminent); *Idaho Conservation League,* 956 F.2d at 1517 (conservation groups challenged Forest Service decision to recommend against designating roadless areas as wilderness; declarations naming specific areas used by members were sufficient to show particularized threat of injury).

One "who observes or works with a *particular animal* threatened by a federal decision" clearly faces "perceptible harm," and one "who observes or works with animals of a particular species in the very area of the world where that species is threatened by a federal decision" may plausibly claim such harm, "since some animals that might have been the subject of his interest will no longer exist." *Defenders of Wildlife,* — U.S. at —, 112 S.Ct. at 2139–40 (emphasis added) (citations omitted). Some sort of specific connection is required. *Id.,* — U.S. at —, 112 S.Ct. at 2140.

We conclude that the supplemental declarations filed by the FSO are sufficiently specific. Declarations submitted in support of the motion to intervene described the nature and purposes of the four organizations, and explained that members of the organization study, observe and enjoy the sea otters in Alaska.[3] Particular members[4] have declared that they have observed, enjoyed and studied sea otters in specific areas in Alaska, including Nakeeta

---

**3.** *See* Declarations of Stuart Somach, the attorney for Friends of the Sea Otter; Lisa Beale Howard, Director of Ocean Ecology Campaign for Greenpeace; Valerie Brown, Executive Director of the Alaska Wildlife Alliance; and John W. Grandy, Vice President of the Humane Society of the United States.

**4.** *See* Declarations of Dave McCargo and Valerie Brown, members of Alaska Wildlife Alliance; and Cindy Lowry, member of the Sea Otter Management Plan Team, the Department of Interior's Oiled Wildlife Working Group, and Greenpeace.

Bay on Shuyak Island, the Islands of the Four Mountains, the Shumigans, the Aleutians, Prince William Sound, Valdez Harbor, Cordova Harbor, and the Valdez Narrows.

The FSO's interests and those of their members are clearly of a greater nature than the interests of the general public. *See Sierra Club*, 405 U.S. at 739–40, 92 S.Ct. at 1368–69; *Animal Lovers Volunteer Ass'n, Inc. v. Weinberger*, 765 F.2d 937, 939 (9th Cir.1985) (per curiam). The interest at stake is the protection and preservation of sea otters. The FSO explain that any permitted takings of sea otters by Alaska Natives will result in increased illegal takings as the market in sea otter fur is revived. This, in turn, will affect other sea otter populations.

The Supreme Court's recent decision in *Defenders of Wildlife* does not preclude the FSO's standing in this case. The FSO's declarants are concerned with action harming sea otters in Alaska, where the declarants live and in particular areas that they frequent, unlike the declarants in *Defenders of Wildlife*. *See Idaho Conservation League*, 956 F.2d at 1517 (declarants demonstrated sufficient geographical nexus to the site of the challenged project that they were expected to suffer' the consequences of the regulation).

We hold that the FSO have standing to proceed with the appeal of the district court judgment.

## V.

The Government's motion to dismiss the appeal stated:

Pursuant to Rule 42(b) of the Federal Rules of Appellate Procedure, the Appellants (the United States Department of the Interior, Secretary of the Interior Manuel Lujan, Jr., Acting Director of the United States Fish and Wildlife Service Richard N. Smith, and Regional Director of the United States Fish and Wildlife Service Walter Stieglitz) ask this Court to dismiss the appeal in this matter, No. 92–35017, without an award of costs to any party.

With the Government having dismissed its appeal and acquiesced in the judgment of the district court, the FSO can no longer argue that the regulation is entitled to the deference that is normally accorded an agency's interpretation of the Act that it is responsible for administering. If any deference is involved, it would be to the agency's dismissal of the appeal on behalf of the Secretary of the Interior and the Acting Director and Regional Director of the FWS. The dismissal appears to be a determination that the regulation does not properly interpret the MMPA. In the present posture of this case, the FSO, in order to prevail, must establish that the amendment to the regulation is the only reasonable interpretation of the MMPA.

In the amended regulation the FWS defined "authentic native articles of handicrafts and clothing" essentially in the words of the statute, but added two additional requirements: (1) that only those items which "(a) were commonly produced on or before December 21, 1972" (the date the MMPA was enacted) would qualify, and (2) "provided that it has been determined that no items created in whole or in part from sea otter meet part (a) of this definition and therefore no such items may be sold." *See* 50 C.F.R. § 18.3; 55 Fed.Reg. 14,978.

The Government was correct in dismissing this appeal and in acquiescing in the district court's order that invalidated these portions of the regulation. A close examination of the statute illuminates the error of the regulation.

The exceptions to the MMPA on the takings of marine mammals are explicitly stated in the statute. The portion of the statute at issue in this case provides that the moratorium does not apply to takings of marine mammals by coastal Alaska Indians, Aleuts, and Eskimos if the taking

is done for purposes of creating and selling authentic native articles of handicrafts and clothing: .... For the purposes of this subsection, the term "authentic native articles of handicrafts and clothing" means items composed wholly or in some significant respect of natural materials, and which are produced, decorated or fashioned in the exercise of traditional native handicrafts....

16 U.S.C. § 1371(b)(2) (1988).

Thus, the statute places two requirements on what may be classed as "au-

thentic native articles of handicrafts and clothing:" (1) they must be made at least in part from "natural materials" and (2) the type of production must be done in traditional native ways, such as weaving, carving, and stitching, but not through methods of mass production.

■ There is no statutory restriction on what marine mammals or any other natural materials may be used to fashion the handicrafts or clothing. There is also no statutory requirement that those items of handicraft or clothing made from natural materials were made and sold prior to 1972. The requirement is that the items be produced, fashioned or decorated in the traditional native way and not mass produced. The plain restriction of the statute is not on what marine mammals or other natural materials can be used, but on the method of production. In fact, Congress rejected amendments that would have limited Native takings "for purposes of commercial sale, except where such a taking is for use in the production and sale of traditional Native arts and crafts in conformity with *existing patterns* of the Alaska Native arts and crafts industry and does not promote commercial growth of this industry." Senate Amd. No. 1154 to H.R. 10420, 92nd Cong., 2d Sess. (1972). *See also* Senate Amd. No. 1153 to H.R. 10420, 92nd Cong., 2d Sess. (1972) (rejecting a provision that permits be issued to Alaska Natives to take marine mammals to protect traditional and existing patterns of the Native arts and crafts industry, but not to promote commercial growth of the industry).

Neither the statute nor the legislative history reveals any intent to exclude sea otters, or any other species, from Native uses. Application of the 1972 cut-off results in the artificial and unintended exclusion of any uses of sea otters or other natural materials.

■ The FWS is not without other authority to regulate any excesses in the takings of sea otters or other marine mammals. Section 1371(b) also provides that the Secretary of the Interior may regulate

the takings by Alaska Natives if the Secretary determines that any species or stock of marine mammals is "depleted." Furthermore, section 1371(b)(3) provides that the takings that are exempted from the MMPA are not to be accomplished in a wasteful manner. We have upheld the Secretary's authority to regulate under section 1371 in *United States v. Clark,* 912 F.2d 1087, 1090 (9th Cir.1990), *cert. denied,* 498 U.S. 1037, 111 S.Ct. 705, 112 L.Ed.2d 695 (1991).

We conclude that the portion of the regulation at issue is not mandated by the MMPA. The judgment of the district court is affirmed.

AFFIRMED.

**GREENPEACE ACTION,\* a non-profit corporation, Plaintiff–Appellant,**